# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                              )
CONSTANT OTTRO BAHI, et al.,                  )
                                              )
            Plaintiffs,                       )
                                              )
      v.                                      )   Case Number:  1:07CV1650 (JDB)
                                              )
MICHAEL B. MUKASEY, Attorney General,         )
et al.,                                       )
                                              )
            Defendants.                       )
_____)

## MOTION TO DISMISS

Defendants Michael B. Mukasey et al., through undersigned counsel, hereby move that

this case be dismissed for lack of jurisdiction, pursuant to Federal Rule of Civil Procedure

12(b)(1), and/or for failure to state a claim, pursuant to Rule 12(b)(6).  A supporting

memorandum and proposed order are filed herewith.

Dated: February 4, 2008                  Respectfully submitted,


                                         _____/s/_____
                                         JEFFREY A. TAYLOR, D.C. BAR # 498610
                                         United States Attorney


                                         _____/s/_____
                                         RUDOLPH CONTRERAS, D.C. BAR #434122
                                         Assistant United States Attorney


                                         _____/s/_____
                                         ROBIN M. MERIWEATHER, D.C. Bar. # 490114
                                         Assistant United States Attorney
                                         555 Fourth St., N.W.
                                         Washington, D.C.  20530
                                         Phone: (202) 514-7198   Fax: (202) 514-8780
                                         Robin.Meriweather2@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

CONSTANT OTTRO BAHI, <u>et al.</u>,          )
                                             )
                Plaintiffs,                  )
                                             )
        v.                                   )    Case Number:  1:07CV1650 (JDB)
                                             )
MICHAEL B. MUKASEY, Attorney General,        )
<u>et al.</u>,                               )
                                             )
                Defendants.                  )
                                             )
_____)

<u>**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**</u>

**INTRODUCTION AND SUMMARY**

The Immigration and Nationality Act requires that the identity of all aliens who seek asylum be checked against all relevant records and databases maintained by the Attorney General and the Department of State.  In accordance with that statutory mandate, United States Citizenship and Immigration Services ("USCIS") has requested that the FBI perform name checks on Plaintiffs Fatou Florence Kaudio and Constant Ottro Bahi in connection with Plaintiff's asylum applications.  USCIS cannot complete its adjudication of Plaintiffs' asylum applications until it receives the results of those name checks; the FBI has not yet completed its investigation into Constant Bahi's identity and background.

The Court lacks subject matter jurisdiction to review Plaintiffs' request for a writ of mandamus or a declaratory ruling compelling USCIS to complete its adjudication of their asylum applications and compelling the FBI to complete the name checks.  The Mandamus Act and the Administrative Procedure Act only permit courts to compel agency action that the agency has a non-discretionary legal duty to perform.  USCIS has no legal duty to complete its adjudication of

an asylum application while name checks remain pending.  To do so would be directly contrary to Congress's mandate that USCIS investigate the identity of all asylum applicants prior to granting asylum.  Likewise, the FBI has no non-discretionary duty to limit the scope of its name check investigations, or complete them within a fixed period of time.  Instead, the FBI has complete discretion over its name check process and security investigations.

Plaintiffs' claims against the USCIS Defendants[1] also fail to state a claim upon which relief can be granted.  The alleged delay in completing the adjudication of Plaintiffs' asylum applications is attributable to the pendency of Constant Bahi's name check.  That is not an "unreasonable" delay, given that the INA expressly requires USCIS to investigate asylum applicants' identity prior to ruling on their applications.

## BACKGROUND

### A.    Statutory Framework

The Attorney General and the Secretary of the Department of Homeland Security ("DHS") may, in their discretion, grant asylum to a "refugee."  INS v. Cardozo-Fonseca, 480 U.S. 421, 428 n. 5 (1987); 8 U.S.C. § 1158(b)(1).  Aliens who seek asylum file an application, on Form I-589, with USCIS.  The Immigration and Nationality Act ("INA") defines a "refugee" as a person unable to return to his or her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42).  If  "there are reasonable grounds for regarding the

---

[1] Michael Chertoff, Emilio Gonzalez, and Ann Kramer are collectively referred to as the "USCIS Defendants."

2

alien as a danger to the security of the United States," that alien is ineligible for asylum, regardless of his or her refugee status.  Id. § 1158(b)(2)(A)(iv).

Congress authorized the Attorney General and Secretary of DHS to establish the procedures for processing asylum applications.  See 8 U.S.C. § 1158(d)(1).  Although Congress left many aspects of those procedures to the discretion of the Attorney General and DHS Secretary, the INA establishes some baseline requirements for the adjudication process.  One such requirement is that "asylum cannot be granted until the identity of the applicant has been checked against all appropriate records or databases maintained by the Attorney General and by the Secretary of State. . . to determine any grounds on which the alien may be inadmissible to or deportable from the United States, or ineligible to apply for or be granted asylum."  8 U.S.C. § 1158(d)(5)(A)(I).

### B.    Plaintiffs' Applications

Plaintiffs Fatou Florence Kaudio, Constant Ottro Bahi, and Paule Emmanuelle Bahi filed Form I-589 applications for asylum on or around November 17, 2004.  See Declaration of Ann Palmer, ¶ 6 (Exh. 1).  Kaudio was the primary applicant, and her spouse, Constant Bahi, and their minor child Paule Bahi, were derivative applicants.  See id.  USCIS requested FBI name checks for Kaudio and Constant Bahi, which were initiated on or around November 22, 2004. See id.

¶ 8.  The Arlington Asylum Office of USCIS interviewed Plaintiffs in connection with their asylum applications on December 20, 2004.

USCIS received the results of the FBI name checks for Kaudio on November 30, 2004. See id. ¶ 8.  However, the name check for Constant Bahi remains pending.  See id. ¶ 8;

Declaration of Michael Cannon, ¶ 41 (Exh. 2). USCIS cannot determine whether Constant Bahi is eligible for asylum until it receives the results of the pending security checks. See Palmer Decl. ¶ 12.

Processing Kaudio's asylum application separately from the derivative applications filed by Constant and Paule Bahi would result in the denial of the derivative applications. See Palmer Decl. ¶ 10. Accordingly, the entire family is awaiting the completion of all security checks for all three applicants. See id. Upon receipt and analysis of the pending security checks, USCIS will continue to review Plaintiffs' asylum applications, and will complete its adjudication of those applications as expeditiously as possible. See id. ¶ 13.

## STANDARD OF REVIEW

Defendants move for dismissal under Rule 12(b)(1) because the Court lacks subject matter jurisdiction to review Plaintiffs' claims. See Fed. R. Civ. P. 12(b)(1). When reviewing a 12(b)(1) motion to dismiss, "the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor." Thompson v. Capitol Police Bd., 120 F. Supp.2d 78, 81 (D.D.C. 2000) (citations omitted); see also Vanover v. Hantman, 77 F. Supp.2d 91, 98 (D.D.C. 1999). "The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." Rann v. Chao, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), aff'd, 346 F.3d 192 (D.C. Cir. 2003). In addition, plaintiffs bear the burden of persuasion, and must establish subject-matter jurisdiction "by a preponderance of the evidence." Thompson, 120 F. Supp.2d at 81; Vanover, 77 F. Supp.2d at 98. To determine the existence of jurisdiction, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately

4

weigh the conflicting evidence.  See Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992); Rann, 154 F. Supp. at 64.

Defendants also move for dismissal under Rule 12(b)(6), for failure to state a claim upon which relief can be granted.  Rule 12(b)(6) requires dismissal if a plaintiff fails to plead "enough facts to state a claim for relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1974 (2007) (abrogating prior standard which required the moving party to show that plaintiff can prove no set of facts in support of its claim which would entitle it to relief).  The Court must resolve all factual doubts in favor of the plaintiff, and allow the plaintiff the benefit of all inferences.  See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

## ARGUMENT

### I.    THIS COURT LACKS JURISDICTION TO REVIEW PLAINTIFFS' MANDAMUS CLAIMS AGAINST THE USCIS DEFENDANTS AND ALL OF PLAINTIFFS' CLAIMS AGAINST THE FBI.

"Federal courts are courts of limited jurisdiction . . . [and] possess only that power authorized by Constitution and statute."  Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994); see also Shaffer v. Veneman, 325 F.3d 370, 372 (D.C. Cir. 2003) (noting that district courts "have only such jurisdiction as the Constitution and the Congress grant them").  The statutes cited in the complaint do not establish a statutory basis for the Court to exercise jurisdiction over this case.  The Mandamus Act does not provide a source of jurisdiction against the USCIS Defendants because Plaintiffs have no clear right to relief.  Neither the Mandamus Act nor the APA confers jurisdiction over Plaintiffs' claims against the FBI, because the FBI has discretion to set the pace and order of its name check investigations.

5

A.    **There Is No Mandamus Jurisdiction to Review Plaintiffs' Challenge to the Adjudication of their Asylum Applications Because Plaintiffs Have No Clear Right to Relief.**

The Mandamus Act gives district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. The writ of mandamus is "a drastic and extraordinary remedy reserved for really extraordinary causes." Cheney v. United States District Court, 542 U.S. 367, 380 (2004) (internal quotations and citation omitted); accord Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980). District courts may issue a writ of mandamus only if three elements are met: "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." In re Medicare Reimbursement Litigation, 414 F.3d 7, 10 (D.C. Cir. 2005); see also Orlov v. Howard, 523 F. Supp. 2d 30 (D.D.C. 2007). "Notably, the Act sought to be compelled must be a 'clear nondiscretionary duty.'" Orlov, 523 F. Supp. 2d at 37; accord Heckler v. Ringer, 466 U.S. 602, 616 (1984). Even when those factors are present, "a court may grant relief only when it finds 'compelling equitable grounds.'" In re Medicare Reimbursement Litigation, 414 F.3d at 10.

Plaintiffs do not have a clear right to have their asylum applications adjudicated before the name checks have been completed. The INA requires USCIS to obtain the results of security checks concerning the alien's identity prior to granting a petition for asylum. Specifically, when directing USCIS to establish procedures for reviewing asylum applications, Congress mandated that any such procedures provide that "asylum cannot be granted until the identity of the applicant has been checked against all appropriate records or databases maintained by the

6

Attorney General and by the Secretary of State, including the Automated Visa Lookout System, to determine any grounds on which the alien may be inadmissible to or deportable from the United States, or ineligible to apply for or be granted asylum."  8 U.S.C. § 1158(d)(5)(A)(I). Congress also has expressly forbidden the grant of asylum to an alien if "there are reasonable grounds for regarding the alien as a danger to the security of the United States."  8 U.S.C. § 1158(B)(2)(A)(iv).

In accordance with that mandate, USCIS has determined that asylum applications should not be granted until it has received the results of all security and background checks conducted on the applicant.  See Palmer Decl. ¶ 5.  As Plaintiffs admit, the name checks have not yet been completed.  See Compl. ¶ 19; Cannon Decl. ¶ 41.  USCIS submitted the name check to the FBI on or about November 26, 2004, and the FBI is performing its check.  See Cannon Decl. ¶ 41.

The name checks the FBI performs are precisely the type of identity checks contemplated by Section 1158(d)(5).  The FBI is a Department of Justice agency and, as such, falls under the supervision of the Attorney General.  See Exh. 3 (Department of Justice organizational chart). The name check determines, inter alia, whether the applicant's identifying information (i.e., name, social security number, or date of birth) matches that of an individual whose name has been recorded in the FBI's databases in connection with an FBI investigation.  See Cannon Decl. ¶ 11.  Thus, if an applicant is a suspected criminal and/or terrorist, or a known associate of such a person, the name check process should reveal that information.  When conducting its name checks, the FBI reviews records in its Central Records System ("CRS"), which contains the FBI's investigative files.  See id. ¶ 4.

7

Given that Congress has made completed identity checks a mandatory prerequisite for asylum, the USCIS Defendants do not owe Plaintiffs a "clear nondiscretionary duty" to adjudicate their asylum applications before the name checks have been completed. The grant of an asylum application generally rests within the discretion of the Secretary of the Department of Homeland Security and the Attorney General. See Cardozo-Fonseca, 480 U.S. at 443 ("[A]n alien who satisfies the applicable standard ... does not have a *right* to remain in the United States; he or she is simply *eligible* for asylum, if the Attorney General, in his discretion, chooses to grant it."); 8 U.S.C. § 1158(b)(1) (providing that asylum "may" be granted to an alien). However, Congress has expressly withdrawn USCIS's discretion to adjudicate asylum applications before the results of the FBI's name check have been received. See 8 U.S.C. §1158(d)(5)(A)(I). Accordingly, USCIS has neither the duty nor the authority to grant an asylum application while the applicant's name check remains pending. Instead, it has a "nondiscretionary duty" to await the results of that identity investigation prior to completing its adjudication.

Plaintiffs' reliance on the portion of the INA which establishes a 180-day time frame for adjudicating asylum applications absent "exceptional circumstances" is misplaced. It is true that the INA provides that "in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed." 8 U.S.C. § 1158(d)(5)(A)(iii). However, given that Congress also has mandated that identity checks be performed on all asylum applicants, the "exceptional circumstances" language must be read to include incomplete name checks. If the fact that an alien's name checks remained pending were not deemed an

"exceptional circumstance," Section 1158(d)(5)(A)(I) would conflict with 1158(d)(5)(A)(iii).

Reading the statute in that manner would be contrary to the well-established canon that

"statutory provisions, whenever possible, should be construed so as to be consistent with each

other."  Citizens to Save Spencer County v. EPA, 600 F.2d 844, 879 (D.C. Cir. 1979); see also

Duncan v. Walker, 533 U.S. 167, (2001) ("It is our duty to give effect, if possible, to every

clause and word of a statute.").

> **B.      There is No APA or Mandamus Jurisdiction to Review the FBI's Completion of Name checks.**

The D.C. Circuit has recognized that "[w]hen it comes to matters touching on national

security or foreign affairs . . . the presumption of review runs aground."  Bruno v. Albright, 157

F.3d 1153, 1162 (D.C. Cir. 1999) (dismissing challenge to denial of visa for lack of jurisdiction);

see generally Voinche v. FBI, 940 F. Supp. 323, 328 (D.D.C. 1996) ("Furthermore, courts

generally have deferred to agency expertise in national security matters.") (citing Miller v.

Casey, 730 F.2d 773, 776 (D.C. Cir. 1984)).  Although the D.C. Circuit made that statement in

connection with a visa application, the same principles apply here.  As explained supra, name

checks are a means of determining whether an individual poses a threat to national security.

Given the obvious national security implications, and the traditional privileges governing law

enforcement activities, there is a heavy presumption against judicial review of the pace and

thoroughness of the FBI's name check process, or other FBI investigations.  See id. at 1162.

That presumption against judicial review, when paired with the fact that neither the Mandamus

Act nor the Administrative Procedure Act permits judicial review of discretionary agency

actions, compels the conclusion that this Court lacks jurisdiction to review Plaintiffs' challenge

to the pace of the FBI's name checks.

**1.    The Name Check Process Is Discretionary and Outside the Scope of APA Review.**

Although the APA is not an independent source of subject matter jurisdiction, it operates in tandem with federal question jurisdiction under 28 U.S.C. § 1331 to permit courts to review challenges to certain agency actions.  See Califano v. Sanders, 430 U.S. 99, 107 (1977); Galluci v. Chao, 374 F. Supp. 2d 121, 128 (D.D.C. 2005); Orlov, 523 F. Supp. at 37 (explaining that district courts have jurisdiction to review APA claims that are not "wholly insubstantial and frivolous").  An agency's alleged failure to act is "sometimes remediable under the APA, but not always."  Norton v. So. Utah Wilderness Alliance, 542 U.S. 51, 55 (2004).  The APA expressly precludes judicial review of agency actions when "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2); Brock v. Pierce County, 476 U.S. 253, 260 n.7 (1986).  That limitation prevents Plaintiffs from using the APA as a means of challenging the FBI's processing of  Plaintiffs' name checks.

 Congress has given the FBI complete discretion to conduct its name checks, and that discretion necessarily includes decisions regarding how and when to conduct those investigations.  See Pub. Law 101-515, 104 Stat. 2101, 2112 (1990) (providing that the FBI "may" establish and collect fees to process name checks for certain non-criminal justice, non-law enforcement purposes, but imposing no deadlines or other limits on the FBI's discretion).  The FBI has determined that "its mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results."  Cannon Decl.  ¶ 20.  That thoroughness and accuracy cannot be sacrificed for speed.  See id.

Plaintiffs have identified no statute or regulation limiting the FBI's discretion over immigration-related name checks, and Defendants are aware of none.  For example, no statutes

or regulations force the FBI to limit its background examinations to a fixed period of time.  See

Safadi v. Howard, 466 F. Supp. 2d 696, 700 (S.D.N.Y. 2006); Shalabi v. Gonzales, No. 06-866,

2006 WL 3032413, at * 5 (E.D. Mo. Oct. 23, 2006) (denying plaintiff's request that the court

compel that plaintiff's background check be expedited); Hu v. Chertoff, No. Civ. S-06-2805-

WBS-EFB, 2007 WL 1515067, at *6 (E.D. Cal. May 22, 2007) ("[T]here are no governing

statutes or regulations specifying a time limit for processing an [legal permanent resident]

application or completing a FBI name check."); Tan v. Chertoff, Civ. No. 04:07-236-HEA, 2007

WL 1880742, at *3 (E.D. Mo. June 29, 2007).  Thus, courts have recognized that they lack

jurisdiction to dictate the terms of FBI background investigations, under the APA or any other

statute.  See, e.g., Omar v. Mueller, 501 F. Supp. 2d 636, 640 (D. N.J. 2007) (finding no APA

jurisdiction to review 'unreasonable delay' claim concerning FBI's completion of background

check for naturalization applicant); Konchitsky v. Chertoff, No. Civ. 07-00294-RMW, 2007 WL

2070325, at *6 (N.D. Cal. July 13, 2007) (noting that "courts squarely addressing the issue of

whether they have jurisdiction to compel the FBI to perform name checks in connection with

adjustment of status petitions have overwhelmingly concluded that they do not"); Shalabi, 2006

WL 3032413, at *5 (concluding court lacked jurisdiction to compel FBI to complete background

checks); Sozanski v. Chertoff, 2006 WL 4516968, at *1 (N.D. Tex. Dec. 11, 2006) (finding no

APA or Mandamus Act jurisdiction to compel FBI to complete background check).

### 2.    There is No Mandamus Jurisdiction For Similar Reasons.

The discretionary nature of the FBI's name check process also precludes Mandamus Act

jurisdiction.  As explained supra, the Mandamus Act applies only when the agency has a "clear,

nondiscretionary" duty to act, and the plaintiff has a "clear right to relief."  See Orlov, 523 F.

Supp. 2d at 37-38.  Plaintiffs can point to no clear and indisputable right to have the name checks

completed within a specific time frame, and the FBI has no statutory or regulatory duty to limit

background examinations to a fixed period of time.  Thus, the Mandamus Act does not confer

jurisdiction to review the pace or any other aspect of the FBI's name check investigations.  See

Sozanski, 2006 WL 4516968, at *1; Patil v. Mueller, No. Civ. 1:07-71-JCC, 2007 WL 1302752,

at *2 (E.D. Va. April 30, 2007) ("[A] writ of mandamus may not issue here because there is no

clear right to 'immediate' adjudication of his application...."); Shen v. Chertoff, No. Civ. 06-

15631-DT, 2007 WL 2004934, at *3-5 (E.D. Mich. July 9, 2007); Grinsberg v. Swacina, 478

F. Supp. 2d 1350, 1353-55 (S.D. Fl. 2007).  Therefore, Plaintiffs' claims against the FBI must be

dismissed for lack of jurisdiction.

## II.    PLAINTIFFS' COMPLAINT FAILS TO STATE A CLAIM AGAINST THE USCIS DEFENDANTS FOR UNREASONABLE DELAY.

Even if the Mandamus Act or  the APA could be construed as permitting this Court to

review the reasonableness of the delay in completing the processing of Plaintiffs' asylum

applications, Rule 12(b)(6) would require dismissal of any such claim.   Agencies are "entitled to

considerable deference in establishing a timetable for completing [their] proceedings."  Cutler v.

Hayes, 818 F.2d 879, 896 (D.C. Cir. 1987).  Section 706(1) claims "can proceed only where a

plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."

Norton, 542 U.S. at 64.  The D.C. Circuit has identified six factors courts should consider when

reviewing claims that allege unreasonable agency delay pursuant to Section 706(1) of the

Administrative Procedure Act:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that

statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

In re United Mine Workers of America Inter. Union, 190 F.3d 545, 547 (D.C. Cir. 1999) (quoting Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 75-77, 79 (D.C. Cir. 1984) ("TRAC"). The "reasonableness of the delay must be judged in the context of the statute which authorizes the agency's action." In re Int'l Chem. Workers Union, 958 F.2d 1144, 1149 (D.C. Cir. 1992).

The Court need not conduct the full TRAC analysis, because Plaintiffs' claims cannot clear the threshold inquiry into whether the USCIS Defendants are "required to take" the actions Plaintiffs seek to compel. "The only agency action that can be compelled under the APA is action legally required." Norton, 542 U.S. at 63. As explained supra, Congress has clearly expressed its intent that name checks be conducted for all asylum applicants prior to the grant of an asylum application. Thus Plaintiffs' unreasonable delay claims seek to compel agency action that is legally forbidden. In light of the statutory language requiring identity investigations for all asylum applicants, the USCIS Defendants' decision to await the results of those name checks prior to completing its adjudication of Plaintiffs' asylum applications is a fortiori reasonable as a matter of law. See generally Clouser v. Espy, 42 F.3d 1522, 1536 (9th Cir. 1994) (concluding that agency's policy of refusing to approve certain requests until claims had been validated did not amount to "unlawfully withheld or unreasonably delayed" agency action because it was consistent with the governing statutes).

13

**CONCLUSION**

For the foregoing reasons, Plaintiffs' complaint should be DISMISSED.

Dated: February 4, 2008                    Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

_____/s/_____
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198   Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

**Of Counsel:**

Michael Metzgar
Associate Regional Counsel
United States Citizenship and Immigration Services,
  Department of Homeland Security

14

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of February, 2008, I caused the foregoing Motion to be filed and served via the Court's Electronic Case Filing system or, should I receive notice from the ECF system that electronic service was unsuccessful, to be served upon plaintiff by first-class mail, postage prepaid, addressed as follows:

R. Scott Oswald, Esq.
The Employment Law Group PC
888 17th Street NW, Suite 900
Washington, DC 20006

                                        /s/  *Robin M. Meriweather*
                            ROBIN M. MERIWEATHER, D.C. Bar # 490114

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| CONSTANT OTTRO BAHI, <u>et al.</u>, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Case Number:  1:07CV1650 (JDB) |
| | ) |
| MICHAEL B. MUKASEY, Attorney General, | ) |
| <u>et al.</u>, | ) |
| | ) |
| Defendants. | ) |
| | ) |

_____)

**ORDER**

Upon consideration of Defendants' Motion to Dismiss, it is this _____ day of

_____, 2008,

ORDERED that this case be and hereby is DISMISSED.

SO ORDERED.

_____
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Constant Ottro Bahi )<br><br>  Plaintiff, )<br><br> )<br><br> )<br><br> )<br><br> v.  )<br><br> )<br> Emilio T. Gonzalez, )<br> Director, )<br> United States Citizenship and )<br> Immigration Services, *et al.,* )<br><br>  Defendants. ) | Case No. 1:07 cv 1650 (JDB) |

## <u>DECLARATION OF ANN PALMER</u>

Pursuant to 28 U.S.C. § 1746, Ann Palmer declares under penalty of perjury as follows:

I, Ann Palmer, hereby declare:

I am the Director of the Arlington Asylum Office, located in Arlington, Virginia, of the United States Citizenship and Immigration Services (USCIS) in the Department of Homeland Security (DHS). I oversee the adjudication of applications for immigration benefits, including asylum applications. I have held the position of Director since January 2007. In that capacity, and based upon reasonable inquiry and my knowledge, information and belief, I state the following:

(1)    When an alien applies for asylum, USCIS conducts several forms of security and background checks to ensure that the alien is eligible for asylum and that he or she is not a risk to national security or public safety. In addition to record checks

against DHS's own immigration systems, these background checks currently include (a) a Federal Bureau of Investigation (FBI) fingerprint check for relevant criminal history records on the alien (e.g., arrests and convictions); (b) a check against the DHS-managed Interagency Border Inspection System (IBIS) that contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies; and (c) an FBI name check, which is run against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS. IBIS includes, but is not limited to, information related to persons who are wanted or under investigation for serious crimes or suspected of terrorism-related activity. No immigration benefit (e.g., asylum, adjustment of status) is granted unless and until all the above-required background checks have been completed and resolved.

(2)     These law enforcement checks can reveal significant derogatory information concerning alien applicants for immigration benefits, including applicants seeking asylum. Such checks have resulted in alien applicants being found ineligible for the benefit sought, and in the USCIS's refusal to grant the asylum application. In some instances, the disqualifying information concerning the alien has been discovered as a result of the IBIS or FBI name checks, when it had not been revealed by a fingerprint check alone.

(3)     If a background or security check reveals verified derogatory information on the alien (i.e., a positive result), the USCIS works with other divisions of DHS and other law enforcement and intelligence agencies, as necessary, to obtain all available information concerning the derogatory record. Depending on the information and the alien's immigration status, USCIS may place the alien in immigration proceedings to remove him or her from the United States.

(4)     Although an alien's file may show that an FBI fingerprint check was performed, the fingerprint checks frequently do not reveal the types of derogatory information described above, particularly when it is not information that has resulted in an arrest or criminal conviction. For example, persons on a "watch list" who are

2

suspected of terrorist activity will not necessarily be identified through an FBI fingerprint check, but could be identified through an IBIS record check or an FBI name check of investigation databases.

(5)    It would be unconscionable and potentially risk the safety and security of the nation for USCIS to grant United States asylum status to anyone without first ensuring that the government's law enforcement databases do not contain verified derogatory information about the alien. With asylum status, a person who is a risk to the public or the nation's security could obtain work in sensitive industries and travel on transportation carriers more easily.

(6)    The principal asylum applicant is Fatou Florence Kouadio, A98-678-914, and the derivative applicants are her spouse, Constant Ottro Bahi, A98-678-915, and their minor child Paule Emmanuelle Bahi, A98-678-916. The applicants' asylum applications, form I-589, were filed on or around November 17, 2004.

(7)    The applicants were interviewed at the Arlington Asylum Office of USCIS on December 20, 2004. All three asylum applications are still pending decision.

(8)    FBI name checks are not required for minor applicants under the age of 14. FBI name checks were initiated on both Fatou Florence Kouadio and Constant Ottro Bahi on or around November 22, 2004. The result of the name check as to the principal applicant was reported back to USCIS by the FBI on November 30, 2004. USCIS has not yet received the results of the name check from the FBI concerning derivative applicant Constant Ottro Bahi as of today's date. A request to expedite this name check has not been filed with the FBI. Expedite requests require additional fees to be paid to the FBI by USCIS and USCIS is limited by the FBI as to the number of requests that can be made. Therefore, such requests are only made in exceptional circumstances. On February 20, 2007 USCIS posted a clarification of the criteria used to expedite FBI name checks on its public website. This clarification made clear that pending litigation was removed as the sole basis to support an expedite request. USCIS may continue to request

an expedited FBI name check for a case in litigation if it meets one of several other approved criteria, including, but not limited to: 1. Military deployment; 2. Age-out cases not covered under the Child Status Protection Act, and applications affected by sunset provisions such as diversity visas; 3. Significant and compelling reasons, such as critical medical conditions, and 4. Loss of social security benefits or other subsistence at the discretion of the USCIS District Director.

(9)    FBI fingerprint checks are not required of applicants under the age of 14 years. FBI fingerprint checks for the remaining two applicants were first submitted to the FBI on December 4, 2004. USCIS received the results of these fingerprint checks from the FBI on the same day. The FBI fingerprint checks must be completed for each alien applicant for an immigration benefit, as required by public law 105-119. Pursuant to current USCIS policy, fingerprints so taken are valid for a period of 15 months after processing by the FBI. Therefore, the first fingerprints expired on March 4, 2006. A second set of fingerprints were processed on April 19, 2006, and remained valid until July 19, 2007. Therefore, both applicants requiring fingerprint checks lack current fingerprints, and new fingerprint appointments will be scheduled as soon as all name checks have been processed. Given the limited time period fingerprint checks are valid it would be an inefficient use of Government resources to schedule new fingerprints for the applicants until all name checks have been processed.

(10)    Processing the principal applicant's asylum application without the simultaneous processing of the derivative applications would result in the eventual denial of any derivative applicant's asylum application who is not processed at the same time as the principal. Therefore, the entire family is awaiting the completion of all security checks for all three applicants.

(11)    IBIS checks are not required for minors age 14 and younger. IBIS checks were initiated on the other two applicants on November 18, 2004, on December 7, 2004 and on February 1, 2008, and have been concluded.

(12)    Constant Ottro Bahi and Paule Emmanuelle Bahi seek asylum status as derivative beneficiaries of Fatou Florence Kouadio's asylum application, and have no independent claim for asylum. As a result, Constant and Paule Bahi are only eligible for a grant of asylum by the Asylum Office while Kouadio's asylum application remains pending. As a matter of practice, USCIS Asylum Offices adjudicate such family applications together, after all necessary name checks have cleared for all family members and any other issue affecting the applicants' eligibility has been resolved. If the Office completed its adjudication of the principal applicant's I-589 before completing its review of the derivative applicants' eligibility, that grant would render the derivate applicants ineligible for asylum, and would require denial of the derivatives' I-589 applications for asylum.

(13)    In consideration of these security checks, there are issues requiring further inquiry by USCIS to determine the applicant's eligibility for asylum status. Specifically, USCIS is still waiting for the results of the original name check of Constant Ottro Bahi from November 22, 2004 to be submitted by the FBI to USCIS for review, and then for the scheduling of new fingerprint appointments for both Constant Ottro Bahi and his wife, Fatou Florence Kouadio.

(14)    Upon receipt and analysis of the results of the pending security checks, USCIS will continue to review the Bahi family's asylum applications and complete their adjudication as expeditiously as possible under the circumstances.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief. Executed on this Fourth day of February, 2008.

Ann Palmer, Director
Arlington Asylum Office
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security

5

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| CONSTANT OTTRO BAHI, ) | |
| Plaintiff, ) | |
| v. ) | Case No: |
| ) | 07-1650 |
| MICHAEL B. MUKASEY, ) | |
| et al., ) | |
| Defendants. ) | |

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program

Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in

Washington, D.C. I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name

Check Units. The statements contained in this declaration are based upon my personal

knowledge, upon information provided to me in my official capacity, and upon conclusions and

determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures

followed by the FBI in responding to requests for information from its files pursuant to the policy

and the procedures of the United States Citizenship and Immigration Services ("USCIS").

Specifically, I am aware of the name check request for Constant Ottro Bahi, the plaintiff in this

civil action.

## NATIONAL NAME CHECK PROGRAM

(4)     The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)     The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

2

compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)  FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

(7)  Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)  The entries in the General Indices fall into two categories:

(a)  "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

(b)  "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)  In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system

consists of the following three automated applications that support case management functions

for all investigative and administrative cases:

> (a) Investigative Case Management: This application provides
> the ability to open, assign, and close investigative and
> administrative cases as well as to set, assign, and track
> leads. A case is opened by the Office of Origin, which sets
> leads for itself and other field offices, as needed. The
> offices that receive the leads are referred to as Lead Offices.
> When a case is opened, it is assigned a Universal Case File
> Number, which is utilized by FBI Headquarters and all
> offices conducting or assisting in the investigation. Using
> fictitious file number "111-HQ-12345" as an example, an
> explanation of the Universal Case File Number is as
> follows: "111" indicates the classification for that specific
> type of investigation; "HQ" is the abbreviated form used for
> the Office of Origin of the investigation (in this case, FBI
> Headquarters); and "12345" indicates the individual case
> file number for that particular investigation.

> (b) Electronic Case File: This application serves as the central
> electronic repository for the FBI's official text-based
> documents. It supports the universal serial concept, where
> only the creator of a document serializes it into a file,
> providing single source entry of serials into the
> computerized system. All serials originated by the Office
> of Origin are maintained in the Office of Origin's case file.

> (c) Universal Index: This application, sometimes referred to as
> "UNI", continues the universal concepts of the ACS system
> by providing a complete subject/case index to all
> investigative and administrative cases. Only the Office of
> Origin is required to index. However, the Lead Offices
> may index additional information as needed. The Universal
> Index, which consists of an index of approximately 100.0
> million records, functions to index names to cases, and to
> search names and cases for use in the FBI investigative and
> administrative cases. Names of individuals or entities are
> recorded with identifying information such as the date or
> place of birth, race, sex, locality, social security number,
> address, or date of event.

4

(10)   The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)   When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program

application searches names phonetically against the Universal Index records and retrieves similar

spelling variations (which is especially important considering that many names in our indices

have been transliterated from a language other than English).

(12) If there is a match with a name in a FBI record, it is designated as a "Hit,"

meaning that the system has stopped on a possible match with the name being checked. If a

search comes up with a match to a name and either a close date of birth or social security

number, it is designated an "Ident."

## RESOLUTION RATE

(13) There are four stages involved in the completion of an individual name

check: batch processing, name searching, file review, and dissemination. The first stage in the

process, batch processing, involves the transfer of the name check requests from USCIS to the

NNCPS on magnetic tapes. Each tape can hold up to 10,000 names. (Some requests are

transmitted via facsimile or verbally via telephone.) The tapes are uploaded into an FBI system

and the names are electronically checked against the FBI's Universal Index (UNI). Historically,

during the batch processing phase, approximately 68 percent of the name checks submitted by

USCIS are returned to USCIS as having "No Record" within 48-72 hours. A "No Record"

indicates that the FBI's Universal Index database contains no identifiable information regarding a

particular individual. Duplicate submissions (i.e., identically spelled names with identical dates

of birth and other identical information submitted while the original submission is still pending)

are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14) The second stage in the process is name searching. For the name check

requests that are still pending after the initial electronic check, additional review is required. An

6

FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS.

(15). The third and fourth stages in the process are file review and dissemination. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(16) Additional searches against the FBI's Universal Index, additional manual name searches, and/or additional file review of a name check request, depending on the length of time a name check request is pending in the processing queue, may occur periodically during the name check process to ensure that stale information is updated.

(17) Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

7

(18)    At each stage of processing, the NNCPS generally works on the oldest
name checks first – a first-in, first-served protocol. This protocol reflects that all applicants are
equally deserving and ensures that all applicants are treated fairly. However, if an applicant's
name check requires a review of numerous FBI records and files, even though that person came
in first, the name check may require additional time until all responsive records are located and
reviewed.

(19)    The general exception to the first-in, first-served policy exists when
USCIS directs that a name check be handled on an "expedited" basis. USCIS determines which
name checks are to be expedited based on criteria it determines. Once designated as an
"expedite," that name check proceeds to the front of the queue along with other prioritized name
check requests, in front of the others waiting to be processed.

(20)    Another exception to the first-in, first-served policy is a near-term effort
agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by
prioritizing "single hit" name checks. This key initiative is explained in paragraph (33) below.

## GROWTH OF THE NAME CHECK PROGRAM

(21)    Prior to September 11, 2001, the FBI processed approximately 2.5 million
name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the
number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4
million name checks.

(22)    A significant portion of the incoming name checks submitted over the past
few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of
the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000)

8

of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45%

(~1,512,000) of the total incoming name checks were submitted by USCIS; and in fiscal year

2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS.

## USCIS NAME CHECK REQUESTS

(23)     In November 2002, heightened national security concerns prompted a

review of the former Immigration and Naturalization Service's ("INS's") procedures for

investigating the backgrounds of individuals seeking immigration benefits. It was determined

that deeper, more detailed clearance procedures were required to protect the people and the

interests of the United States effectively. One of the procedures identified was the FBI's name

check clearance. Before November 2002, only those "main" files that could be positively

identified with an individual were considered responsive to the immigration authorities name

check requests. However, because that approach ran a risk of missing a match to a possible

derogatory record, the FBI altered its search criteria to include "reference" files as well. From a

processing standpoint, this meant the FBI was required to review many more files in response to

each individual background check request.

(24)     In December of 2002 and January of 2003, the former INS resubmitted 2.7

million name check requests to the FBI for background investigations of all individuals with

then-pending applications for immigrations benefits for which the Immigration and Nationality

Act required background investigations. Those 2.7 million requests were in addition to the

regular submissions by the former INS. Currently, the FBI has returned an initial response to all

2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to

those resubmitted requests indicated that the FBI had no information relating to the specific

9

individual who was the subject of the request, approximately 16 percent – or over 440,000 –
resubmitted requests indicated that the FBI may have information relating to the subject of the
inquiry. The FBI is still in the process of resolving those 440,000 requests. Currently, less than
6,300 of those resubmitted requests remain pending.

(25) The FBI's processing of the more than 440,000 residuals has delayed the
processing of regular submissions from USCIS. A dedicated team within NNCPS has been
assigned to handle only these re-submitted name check requests. To the extent that the team
members are working on only these applications, they are unavailable to process the normal
submissions.

(26) There are numerous factors that have contributed to delays in the
processing of name check requests. One is the volume of incoming name checks – the total
volume of incoming name check requests combined with pending name check requests has
historically outpaced the NNCPS's available resources to process this volume. As it concerns
submissions by USCIS, for Fiscal Year 2006, USCIS submitted approximately 1,633,000 name
check requests, of which approximately 718,000 represented naturalization-related name checks
and approximately 658,000 represented adjustment of status-related name checks. As of the end
of Fiscal Year 2006, the NNCPS had over 364,600 pending USCIS name check requests, of
which over 157,300 represented naturalization-related name checks and over 157,800
represented adjustment of status-related name checks.

(27) The number of "hits" on a name when it is reviewed may further
contribute to a delay in processing a name check request. A "hit" is a possible match with a

10

name in an FBI record. The number of times the name appears in FBI records correlates to the number of records which require review.

(28)    The processing of common names also contributes to a delay in processing a name check request. The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on. Without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records. Common names can often have more than 200 hits on FBI records.

(29)    The accessibility of the FBI record needed for review also contributes to a delay in processing a name check request. If the date of the record predates October 1995, the paper record has to be located, retrieved, and reviewed; if the date of the record is later than October 1995, the record text may or may not be available electronically depending on the type of record and whether it has been uploaded electronically. A paper record could be at one of over 265 possible locations across the country. Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices. One person's name check may involve locating and reviewing numerous files, all at different physical locations. Each request must be communicated internally from the NNCPS to the field, and handled according to the current priorities of the particular field office. Since it is a paper based process, it is a process subject to misplaced or misfiled files. The process is time consuming and labor intensive.

(30) Another contributing factor which was briefly mentioned earlier in this declaration is the expedited request. Processing an expedited case means that an employee is not available to work on a normal name check request.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(31) The FBI is seeking a number of improvements to its process. Over the short-term:

(32) NNCPS is continuing to develop the Name Check Dissemination Database ("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

(33) NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks. For example, the FBI and USCIS have implemented a key initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name Check requests, that is, pending name check requests that have only one FBI file potentially identified with it that needs to be reviewed in order to process the request. By applying contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the pending USCIS name check workload.

(34) The FBI is in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee

12

can begin to significantly impact the NNCPS workload. These efforts have led to the development of a name check employee training manual.

(35)  NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database. It is also building an Electronic Records System that allows for future automation of the name check process.

(36)  NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(37)  As a mid-term improvement, NNCPS is exploring technology updates to the name check process. Specifically, the FBI procured textual analysis software in order to investigate ways to further automate the name check process. The goal is to incorporate analytical software applications that reduce the time spent to verify the identity of the individual and, once verified, assists in the adjudication analysis. This type of automation should decrease the time required to process a name check, thereby increasing production. The FBI is building a proof of concept system for eventual integration into the FBI's core databases.

(38)  As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. Currently, paper files/information must be retrieved from over 265 locations throughout the FBI. The Central Records Complex will address this issue, creating a central repository-scanning of documents, and expediting access to information contained in billions of documents that are currently manually accessed in locations around the United States and world. In addition, the essential long term improvement for FBI Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check

13

services. Once in place, the FBI will be able to scale resources proportionally with workload demands -- pending name checks will pay for themselves. At this time fees do not cover the basic costs of providing the service. Therefore, the FBI cannot adequately apply resources to processing name checks without pulling critically needed personnel and funding from other programs. The FBI procured services to conduct a study to determine an appropriate fee structure. The independent contractor hired to conduct the study has completed its work and the proposed fee structure is undergoing the Federal rulemaking process.

(39)   For the reasons stated earlier, the FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited at the request of USCIS, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of expedited name checks the analyst must process for, among others, military deployment, "age-outs," sunset provisions such as Diversity Visa cases, compelling reasons such as critical medical conditions, and loss of Social Security or other subsistence; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. Unfortunately, the proprietary software NNCPS utilizes to process name checks does not report where in the processing queue a particular name check request may lie vis-à-vis other name checks. Additionally, until review of each case is undertaken no estimate for the time required to complete it can even be attempted, no estimate can be made as to when the plaintiffs' cases will be reached by NNCPS staff, nor can any reliable estimate be made as to how long it will take to

14

complete the review once it has begun. While the FBI is sensitive to the impact of the delays in

processing name check requests, the consequence of the FBI's mission on homeland security

requires that its name check process be primarily focused on providing accurate and thorough

results. When the name check is completed, the FBI provides the results to USCIS as quickly as

possible.

(40)    It is important to note that the FBI does not adjudicate applications for

benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a

summary of available information to USCIS for its adjudication process.

## PLAINTIFF'S NAME CHECK REQUEST

(41)    The USCIS has submitted the name check request for plaintiff Constant

Ottro Bahi to the FBI twice. The first name check request for plaintiff Constant Ottro Bahi was

received by the FBI from USCIS on or about November 26, 2004 and has not been completed.

The FBI is performing its check in response to USCIS's request in accordance with the

procedures outlined above. The results of the name check will be forwarded to USCIS in

Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(42)    The second name check request for plaintiff Constant Ottro Bahi was

received by the FBI from USCIS on or about March 30, 2006 and was identified by the name

check program as a duplicate of the currently pending name check. This information was

provided to USCIS per the procedures outlined in paragraph (13) above.

15

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge and belief.

Executed this _10th_ day of December 2007.

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

16

